Good morning. May it please the Court, my name is Dean von Kallenbach. I'm the attorney for Pyramid Plastics. I have to reserve two minutes, if I may, for rebuttal. This case involves a claim under Section 2313 of the California Commercial Code for Indemnification. The threshold question in this lawsuit was whether the buyer, Roundhouse, had furnished specifications to the manufacturer, Pyramid. And we contend that the district court erred when it concluded that Roundhouse had not furnished specifications and therefore Pyramid was not entitled to indemnification. This case involves a fairly mundane product. It's a little plastic sleeve you put CDs into. And the infringing aspect of the sleeve are two little welds that essentially make the sleeve a little smaller and you push the disc in and it locks it into place. Where the district court went wrong, we contend, is in focusing on who came up with the idea for these locking welds. And the court concluded that the idea had originated with an engineer who used to be at Rembrandt and eventually went to Pyramid Plastics. We contend that's error because Section 2312 is not concerned about where an idea comes from. What that section is concerned with is who furnishes the specifications. Does the buyer furnish the specifications or does the manufacturer furnish the specifications? As I understand it, Miller not only came up with the idea while he was at Rembrandt, but he also suggested it to Roundhouse later that that would solve their problem. Actually, no. What happened was in 1994 when Miller was an engineer for Rembrandt and Rembrandt was trying to get the contract from Roundhouse, he suggested to Roundhouse that they incorporate this idea into their design. Right, he suggested it. Sure, he suggested it. Roundhouse said, great idea. They put it into their design and then they said, we don't want to use you, Rembrandt. We're going to use 20th Century Plastics. And they manufactured with 20th Century Plastics this CD sleeve with locking welds for three years. In the interim, Miller leaves Rembrandt, forms a company called Pyramid Plastics, Inc., which then becomes Pyramid Plastics, LLC, in which he's a minority owner. And now we're four years down the road. And Roundhouse has been having these sleeves manufactured for four years with locking welds, for three years by 20th Century Plastics and for one year by Pyramid. I want to ask a slightly off the wall, well, it may sound like an off the wall question, because I've been staring at the language of 23123 without the benefit of having lived with this section for a while. And it's been all obvious to me, although I understand the comments seem to assume it, that saying that a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim is the basis for an indemnity claim. I mean, it sounds like it's a basis for saying you don't have to pay the seller. But why is it a basis for saying the seller has to pay the buyer? Well, if I'm a manufacturer of a product and I put the product in the marketplace and that product infringes on somebody's patent. I'm just wondering what hold harmless means in this context. Well, in this case, it would hold. Usually it means you don't have to pay me. It doesn't mean I have to pay you. No. What it means is if I am the manufacturer and you give me the specifications and I manufacture a product and then I get sued for infringement as the manufacturer, then you, the buyer, have to indemnify me for my cost of defendant. I understand that. That's what you're saying. I understand the comments probably support it, but it isn't what the language means to me. Well, I can only tell you, Your Honor, that the Federal Circuit in Hydromatic when it looked at the language said that's what it means. And then the Fifth Circuit in Bono when it looked at the language said that's what it means. I understand. There's been an assumption that's what it means. It's a very strange assumption when the first sentence says that it reads directly like an indemnity requirement, but the second one reads like simply and this won't apply in these circumstances, which doesn't seem to me to create a separate cause of action. But we'll deal with that separately. All right. All right. Go ahead. So, again, we go back to Section 23123 and, again, focus there under the section is who furnishes the specs, not who comes up with the idea. And in this case, again, the idea came up, was developed in 1994, four years before what we're talking about here because the critical date here is March of 1998. That's when Rembrandt came forward and said, hey, by the way, we have a patent. Here's a cease and desist letter. If you continue to manufacture, you're going to be infringing our patent. And at that point in time, Roundhouse had a couple of different options available to it as the purchaser. It could have said to Pyramid, okay, stop manufacturing CD sleeves. It could have said to Pyramid, okay, keep manufacturing the CD sleeves, but take out the locking wells. And, indeed, that's what Pyramid recommended. Pyramid said, look, we don't think we're infringing, but we recommend you change these CD sleeves to eliminate this feature so that there's no question of infringement. Roundhouse didn't take either of those courses of action. What Roundhouse said essentially was, we're not going to change our design for anybody. Pyramid, you continue to manufacture these sleeves exactly as we told you to manufacture them. You manufacture these sleeves with locking wells.  Yes, Your Honor? But the district court said that there was no evidence that Pyramid told Roundhouse the locking wells should be eliminated. What's the difference? Well, the district court, again, was making a distinction here, saying we didn't tell them to eliminate them. We recommended that we eliminate them. And we didn't object to it when Roundhouse decided not to. That's a distinction, really, that's pretty much irrelevant because we get back to the point here that it's Roundhouse's decision as the purchaser as to what to do. And they did have courses of action open to them. But what they decided to do in the face of getting a cease and desist letter was to continue having Pyramid manufacture these sleeves with the infringing feature, the locking wells. At that point — Pyramid could have said, no, we're not doing it. Well, Pyramid could have said no. And that's, again, where the district court went off on Section 2615 and said, Pyramid, you could have said this was commercially impracticable and decided not to manufacture. The problem with that is it really isn't commercially impractical if you look at the criteria for that under 2615. But more importantly, what the district court's analysis would do would be to put the risk on to Pyramid now. Pyramid would then be placed in a position of either saying — But what the district court ultimately did, which has a fair amount of appeals, basically say you have pox on both your houses. It did. I totally agree with you. But that's the wrong approach, and here's why. Pyramid, as the manufacturer, is entitled to rely upon this Section 2312 of the Code. And what the district court was saying is, Pyramid, once you got the cease and desist letter, you had to decide whether or not to stop manufacturing. And if you decided to keep manufacturing, you assumed the risk. Well, that's not the way the statute works. And the problem is, from Pyramid's perspective, we didn't believe we were infringing. We didn't think the product infringed. But we now have to make a choice, according to the district court. Either we stop manufacturing, thereby breaching our contract with Roundhouse, arguably, and then facing a lawsuit from Roundhouse, or we continue manufacturing following Roundhouse's direction and face an infringement lawsuit from Rembrandt. In terms of the record, the term furnished specifications is somewhat — suggests a buyer comes in and says, you know, here are the specifications. Here's what we want you to make. That isn't exactly what happened here, as I understand it. What happened here was there was sort of a back-and-forth, and there was some agreement about what the specifications should be, and then they signed into a contract which attached specifications, but that the buyer did not walk into the transaction with those specifications. Is that accurate so far? Well, yes and no, in the sense that there was some back-and-forth. But essentially, this is the same — the CD sleeve that Parham manufactured for Roundhouse was essentially, with minor differences, the same sleeve that 20th Century had been manufacturing for Roundhouse for three years before we even got there, before we were even in existence. As far as the locking welds go, there was no difference whatsoever. It was the same — exact same locking welds had been done for three years before. So in that regard, these were Roundhouse's specifications. I mean, we're talking tolerances of, you know, three hundredths of an inch is what we're dealing with here. So these are specifications from Roundhouse to us, and Roundhouse is saying you will follow these specs. And the key point is that as of March 8th, when they got the cease and desist letter, Roundhouse had a number of options open to it, and Roundhouse decided to direct us to manufacture the CD sleeves according to their specs. And what Roundhouse had at that point was as much information as Pyramid, or at least access to as much information about whether there was an infringement. They can go get the patent, and they can make a decision. Correct. Both parties, as of March 8th, had the exact same information. The patent was a matter of public record. Both parties now knew about the patent, and Roundhouse could make their own decision. They had their own lawyers. In fact, when the lawsuit was filed, they filed a counterclaim to invalidate the patent, claiming the patent was invalid. So they had as much information as we did. And so the key here is you look at it as of March of 1998, and at that point in time, Roundhouse is the one who made the decision to go forward. We simply did what they asked us to do. And under the statute, we're entitled to indemnification. You've used all your time. All right. Thank you. Thank you. Good morning. May it please the Court. My name is Ken Black. I'm counsel for Roundhouse, and that much is obvious, I'm sure. I think the Court is focusing on precisely the right issue here, and that issue is, who furnished the specifications? That is the language under Section 2312, and it's the language that the district court interpreted. Under these facts, we think it is crystal clear that the specifications were furnished by, in this case, the seller, Pyramid. That's true for two fundamental reasons. One is, as the Court has already recognized, in 1994, Mr. Miller, who ultimately would go on to found Pyramid. But that wasn't Pyramid. That's true. He was then employed by Rembrandt, and at that time suggested the design. So I don't know why that's pertinent. I think it's pertinent in the sense that the idea for the specifications came from the ultimate founder of Pyramid. The Bono Court, which is the Fifth Circuit case that we've cited, recognizes sort of a but-for test. But for the inventor, would the technology be used? That's true, if he had been working for Pyramid at the time. But he wasn't. I mean, I understand that he was a principal of Pyramid. But still, I mean, in terms of, you know, traditional corporate veil issues, he wasn't Pyramid. So I don't quite see the point of it. And I think that is a fair point. What I would suggest is, standing alone, if that were the only fact, this might be a different case. That doesn't stand alone. In fact, as we look at what happened in 1997, when Mr. Miller was with Pyramid, there is a back and forth. As the Court has suggested, there was an exchange, a collaboration of what we're going to do with these specifications. And, in fact, there are two memoranda in the supplemental excerpts of record that I would direct the Court's attention to. They're found at pages 84 through 87 of the supplemental excerpts of record. And those memoranda show Mr. Miller very plainly describing the specifications. When you look at those specifications, the terminology spot weld is used. And that is the same thing as the locking weld that's referred to in the briefs. And so it's very plain that even into 1997, when Mr. Miller was with Pyramid, it was Pyramid that was furnishing the specifications, suggesting the idea, recommending that we go with it. Kagan.  I mean, the answer may well be that this is a case that the statute was not intended to cover because nobody thinks they basically, the specifications were agreed upon rather than furnished by one or the other. That may be. And the district court didn't say it quite that way. But the pox upon both of your houses is a good analogy. That is, in effect, what the Court did and said, particularly after March, when the cease and desist letters came, we don't think either party ought to bear the burden of indemnifying the other. The point is that at very most, it is a collaboration. We think it is more likely a furnishment by Pyramid of these specifications. If they hadn't sued you for indemnification, would your client have sued them for indemnification? I don't know the answer to that question. It's a hypothetical that I don't know the answer to. We counterclaimed, obviously. I know you counterclaimed, but you didn't file for indemnification. We didn't. Part of the reason for that may be that Roundhouse settled the litigation early on. In fact, the period of manufacture of these infringing sleeves was only March. I mean, after the cease and desist letters was March of 98 to October of 1998. And so there was little involved there. And it was a fairly prompt settlement of the claim by Roundhouse. Plus, you had an agreement with Rembrandt to pay anything that you were permitted, but then Rembrandt went out of business. That was part of the settlement agreement. And there was, of course, a supply agreement in conjunction. And they went out of business. So that's why you were left with the problem. That's essentially correct. And here, of course, the problem is only ours if this Court were to reverse the district court's finding. I point out, by the way, that the district court's opinion reads more as though it's about to impose liability upon Pyramid. If it was a close call for the district court, I would suggest that it struggled – that Judge Minnell struggled with whether to impose indemnification liability upon Pyramid, ultimately chose not to. And, of course, we didn't choose to appeal that decision. We think that the district court got it right. The thing I would say is we need to step back and figure out what the policy is. What is this statute about? And why was it put into place by the drafters of the Uniform Commercial Code and then adopted by California? I would suggest the policy is this. This statute asks the question, who is in the better position to judge and evaluate and then avoid the risk of infringement claims? If that's the question, and some commentators suggest that's exactly what this statute is about, there is no question in this case that Pyramid was far better situated to decide is there a risk of infringement or is there not? It's plainly the case prior to the cease and desist letters coming. The reason that's true is that Roundhouse had no idea there was a patent. In fact, Mr. Miller – Mr. Pyramid didn't exactly either. He knew there had been an application for a patent. He left the company. He never heard that the patent was there. The last thing he heard is it had been rejected, is my understanding. And that's what he knew, as far as the record shows, right? We don't have evidence that he knew there was a patent. That is true. He didn't know there was a patent either. What he did know is that it had been tentatively rejected by the examiner, and then he knew that there was going to be further dialogue. And, of course, as the inventor, as the named inventor in the application, it is his right at any time to inquire of the patent and trademark office to find out. At that point, he didn't have any interest, and he just, you know, thought maybe somebody would have told him. But he certainly didn't know there was a patent. The record – that's true. That is the record on this point. Although I would say if I'm the inventor and I'm asked by a buyer to use locking welds, and I know that I've been party to an application in the past, I might want to inquire to find out whether the patent ever issued. And I think that's the point. I think that's what the district court seized upon. As between the two parties, who's better situated to figure out whether the patent was issued? But as of March 8th, you were both equally situated. That is – I think that's true, except in this limited respect. Mr. Miller knew in ways that Roundhouse could never know what his involvement was in actually inventing and getting to the technology. One of the arguments that the district court adopted in connection with the underlying infringement lawsuit was Asinor Estoppel. In other words, Mr. Miller, you invented, and so you can't come in and challenge the validity. My client, Roundhouse, could not possibly have known the merits of that Asinor Estoppel argument in the same way that Mr. Miller could have understood, because he knew his role. It's also true that after the cease and desist letters came, he even then did not step forward and disclose, oh, by the way, I was involved in the application. I was involved, and I'm the inventor. And so I would suggest that even after those cease and desist letters come, at most the parties are in equal position. I would suggest Pyramid's in even a slightly better position. In any event, the district court was absolutely correct when it concluded that Pyramid had the choice. Pyramid could have stopped manufacturing at that moment. It could have invoked the provisions of Section 2615 of the California Commercial Code and simply stopped supplying the sleeves to Roundhouse. It didn't do that. Instead, what the record reflects is that it viewed Roundhouse as an important customer. It even went so far as to suggest that it did not believe there was infringement, and ultimately it made the decision to go forward. I also point out that it was Pyramid that litigated this matter to the Hill. It was Roundhouse who settled early on, and now Pyramid comes to this Court and says, please shift the risk. Please ask Roundhouse to bear the consequence of our decision to litigate this to the tenth degree, and ultimately we think it is unfair that that risk be shifted. Well, there was a good reason for that, which was that Pyramid basically lost out, because the way that you set up the cases, I understand, it was to go and buy these things from Rembrandt instead of from Pyramid or in addition to Pyramid. So they lost substantially as a result. They did lose the business. And you can appreciate Roundhouse's position. They had really no choice. But you didn't want to the sleeves. You didn't care where they came from, basically. As long as we got that locking well design. That's right. That's absolutely right. I guess the fundamental point here is, though, is it fair then to shift the risk of Pyramid's unilateral decision to pursue this litigation over to Roundhouse under these circumstances? We think that the limited case law that there is clearly supports the district court's decision. The Jack Frost case is very analogous. It is, and we freely concede, both unpublished and not binding on this Court. It was, however, relied upon heavily by the district court. And so we commend it only insofar as it has value to this Court. We think, fundamentally, this Court should affirm the district court's ruling and judgment and not require Roundhouse to indemnify Pyramid. Thank you. All right. Thank you very much, counsel. Pyramid Plastics v. Roundhouse Products is submitted. We will take up United States v. Nobrega. Thank you.
judges: Wardlaw,berzon, Fitzgerald